UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

────────────────────────────────

GERRY A. KING,

                Petitioner,

    v.

THOMAS GRIFFIN,

                Respondent.

9:17-CV-0321
(MAD)

────────────────────────────────

APPEARANCES:                          OF COUNSEL:

GERRY A. KING
Petitioner, pro se
10-B-3953
Green Haven Correctional Facility
P.O. Box 4000
Stormville, New York 12582

HON. ERIC T. SCHNEIDERMAN          DENNIS A. RAMBAUD, ESQ.
Attorney for Respondent            Ass't Attorney General
New York State Attorney General
28 Liberty Street
New York, New York 10005

MAE A. D'AGOSTINO
United States District Judge

## DECISION and ORDER

## I.    INTRODUCTION

    Petitioner Gerry King seeks a writ of habeas corpus pursuant to 28 U.S.C. § 2254.

Dkt. No. 1, Petition ("Pet.").  Respondent opposes the petition.  Dkt. No. 8 (Resp. Answer);

Dkt. No. 8-1 (Resp. Memorandum of Law); Dkt. No. 9, State Court Records ("SCR"); Dkt. No.

9-2-9-4, Transcripts ("T.").  Petitioner filed a reply.  Dkt. No. 18, Traverse.

    For the reasons that follow, petitioner's habeas petition is denied and dismissed.

## II.    BACKGROUND

### A.    Overview

The facts associated with the underlying criminal conviction are not in dispute.

Generally,

> [o]n November 15, 2009, [petitioner] drove to the home of his
> stepfather (hereinafter the victim) and beat him to death. [Petitioner]
> was apprehended two days later in Connecticut, at which time he
> confessed to assaulting the victim. He was charged in an
> indictment with murder in the second degree and, following a jury
> trial, was found guilty as charged. County Court sentenced
> [petitioner] to a prison term of 25 years to life . . . .

*People v. King*, 124 A.D.3d 1064, 1064-65 (3rd Dep't 2015).

### B.    The People's Case

Petitioner did not have a very good relationship with the victim, his stepfather, George

King.  T. 528 (observing that the "relationship between [petitioner] and George . . . wasn't

very good"); 540-41 (confirming that "[petitioner] and George fought [both physically and

verbally] quite a bit").  Petitioner lived with his girlfriend, Jolene, and her two sons, Ray J and

Davy, both of who commented that petitioner did not like George and wanted to harm him.  T.

677-78, 741-43.  When petitioner's mother, Mae King, died in October 2007, the relationship

became even more volatile: about six months after Mae's death, petitioner began calling

family members, intoxicated, and declaring that George was "disgrac[ing]" Mae's memory.  T.

491.  Petitioner left George voicemail messages "threatening to hurt him . . . like he had

never been hurt before."  T. 493.  Petitioner also told his sister "that he should kick [George's]

ass and George deserved to die . . . ."  T. 529; *see also* T. 538.  Petitioner suspected George

of foul play with respect to his mother's death.  T. 491.

2

In or around September 2009, petitioner informed his sister that "he felt like he had to kill George because George disrespected Ma[e]." T. 592. Specifically, petitioner was enraged because "he had heard George done [sic] things to [his sisters] . . . and other girls." *Id.* Petitioner's sister testified that about a month after Mae passed, in or about November of 2007,

> George came up behind [her] and put his hands on [her] hips and rubbed himself up against [her] and asked [her] if [she] would like to fool around . . . [S]he immediately took his hands off [her] hips and told him that was not a proper . . . way to treat [her] and [she] d[id]n't never [sic] want that to happen again. And [George] was fine with that and he said he was sorry and that was over with.

T. 534. Petitioner's sister told one of her siblings about the occurrence, but did not tell petitioner. T. 534-35, 590-91.

In October 2009, petitioner informed his sister, who was planning an annual holiday party, that George should not be invited. T. 494-95. Specifically, petitioner stated that he did not "want [George] near his kids . . . [b]ecause George is huggy-kissy . . . ." T. 495.

On November 15, 2009, petitioner was at home and drinking beer. T. 679-80. Upon leaving the house, petitioner stated that "he was going to go . . . take care of George or . . . settle things with George." T. 681. Petitioner then exited the home, got into his vehicle, and drove away. T. 681-82. At or about 4:30 PM, Davy returned home from a friend's house and asked where petitioner was. T. 741. Ray J responded "that [petitioner] went to go beat up George," which provoked no reaction from Davy "because [petitioner would] usually . . . say that . . . [w]hen he was drinking." T. 741-42.

When petitioner later returned, "he was kind of drunk . . . and . . . told [Ray J] and Davy that 'I finally did it'" and told Davy specifically "'I killed him. I killed the son of a bitch.'"

3

T. 683, 744.  Petitioner was calm, yet seemed scared; he had blood on his shoes and shirt, his shirt was ripped, he had bright red scratches on his skin, and his hands were swollen.  T. 684-85, 689, 727, 744, 748-49, 774-75.  Petitioner put his clothes in the wood stove and lit them on fire.  T. 726-27.  Petitioner instructed Davy "to get rid of [his bloody sneakers]," and Davy complied.  T. 749-50.

Jolene returned home from work, petitioner met her in the driveway, and the two had a calm conversation which started outside and continued in the kitchen.  T. 687, 753-54. "[Petitioner] said he left his hat . . . at George's," then he and Jolene left, in her car and returned about a half an hour later.  T. 688, 756-57.  Shortly thereafter, the pair briefly returned to George's to fix a phone that had been damaged during the fight.  T. 688, 819-20. When they arrived home, petitioner had a conversation with Jolene and her sons about whether he should turn himself in to the authorities.  T. 690-91, 758.  Petitioner listened to their suggestions to do so intently.  T. 690-91.  Petitioner then asked Davy to find the bloody work gloves that were in his car.  T. 763.  Davy found the gloves and placed them in the bag with the bloody sneakers; he and his mother then got in the car, drove to a rural and wooded area, and threw the bag into the woods.  T. 764-67.

The next morning, Jolene warned Ray J not to discuss the matter at school.  T. 692. After school, a second conversation occurred regarding whether petitioner should turn himself in.  T. 774.  Despite his family's urging to do so, petitioner, Jolene, her mother, and Ray J decided to go to Connecticut instead.  T. 693, 774.  Davy remained home.  T. 694, 771-72.

Later that evening, several police officers went to petitioner's home looking for him but only Davy was present.  T. 779, 844-47.  Davy first said that petitioner and his mother were

out to dinner, but eventually told them that they had gone to Connecticut.  T. 781-88, 847-850.  Davy also showed the officers where he and his mother disposed of petitioner's clothes and sneakers; officers recovered the bag with the evidence inside.  T. 790-91, 858-860.  From the outdoor fire pit, investigators also recovered clothing debris and a note stating, "'went to George's to set shit straight, love [petitioner].'"  T. 975-76.

The next morning, police officers apprehended petitioner, Jolene, her mother, and Ray J.  T. 694-95, 851.  After waiving his *Miranda* rights, petitioner provided a detailed written statement to the police.  T. 888-93, 896-907.  The statement described petitioner's relationship with George as "not . . . good" and discussed a fight the two of them had when petitioner was fifteen which prompted him to move out of his parents' home.  T. 900.  The statement outlined George's actions with respect to petitioner's sister, as well as claims petitioner made that others accused George of being a pedophile.  T. 901.

Petitioner then described the events that occurred on November 15, 2009.  *Id.* Petitioner was visited by his sister's ex-boyfriend, who confirmed the story about George inappropriately propositioning and touching petitioner's sister.  T. 901-02.  Petitioner had some beers and, between 4 PM and 5 PM, "know[ing that] every one else in the family don't [sic] want George to come to family get-togethers," decided to go to George's house and tell him not to attend the holiday party.  T. 902, 908.  Petitioner knocked on the door, George answered, and petitioner "confronted him about what he did to [petitioner's sister] and told him . . . [not] to come to any more family get-togethers."  T. 902.  George responded by punching petitioner in the face, "then [petitioner] lost it . . . [and] shoved [George] right into the cupboards by the door. [They] started swapping punches [and] . . . ended up in [George's] bedroom."  *Id.*  Petitioner reported "scuffl[ing] for about 15 to 20 minutes," and next recalling

5

"George lying on his bedroom floor bleeding from his head and mouth . . . calling [petitioner] a fucker."  T. 903.  Petitioner did not "remember doing anything to George except punching him."  *Id.*  When petitioner left, George "was alive, although he was not doing good."  *Id.*  After arriving home, petitioner realized he left his hat at George's and returned to get it and "check on George."  *Id.*  He found George, still in his room, without a pulse.  *Id.*  Petitioner recovered his hat and returned home.  *Id.*

When Jolene arrived home from work, petitioner told her what happened.  T. 904.  She instructed petitioner to get out of his clothes and give them to her and Davy, who promptly disposed of them.  *Id.*  Petitioner and Jolene again returned to George's home so that the petitioner could wipe off a phone that had toppled to the ground and the door handles to "erase [his] fingerprints."  T. 905.

The following day, Jolene went to work and petitioner went to Jolene's mother's house because he "was too nervous staying at [his] house [and] . . . didn't think anybody [sic] would look for [him] there too quickly."  T. 905.  That evening, petitioner, Jolene, her mother, and Ray J left to go to Connecticut.  T. 906.  They stayed overnight at a motel and the following morning, on the way to breakfast, were apprehended by the police.  T. 906-07.

Doctor Michael Sikirica, from the Rensselaer County Medical Examiner's Office, performed an autopsy on George King's body.  T. 1054-56.  Dr. Sikirica attributed George's death to a subarachnoid hemorrhage (a hemorrhage beneath the lining of the brain); cerebral edema (swelling of the brain); and severe facial fractures resulting from blunt force trauma.  T. 1063-65.  Dr. Sikirica also noted "evidence of some strangulation injur[ies] because of the broken bones and the hemorrhage in the neck, but [he] believe[d] those [injuries] occurred before the fatal injuries."  T. 1066.  Moreover, Dr. Sikirica commented on the absence of

6

overkill, "a type of killing that is excessive, that goes significantly beyond the amount of force that is required to kill an individual. [It u]sually involves an excessive number of injuries . . . well beyond what would be normally required to kill an average individual."  T. 1080-81.

### C.    The Defense Case

Lisa Peragine testified that she had known petitioner since they were children and that she remained a good friend to one of his sisters.  T. 1138-39.  Lisa observed that the relationship between George and the petitioner was "[k]ind of rocky," and petitioner's displeasure towards George increased after Mae's death.  T. 1141-44.  She also recounted an experience she had with George when she was 17 or 18 years old where George "gave [her] a hug, kissed [her], and tried to force his tongue in [her] mouth."  T. 1145.  Lisa informed several people of the occurrence and avoided George thereafter.  T. 1146.

For the month preceding George's death, petitioner told Lisa, on "[s]everal occasions," that, in sum and substance, "he wanted to kill his dad."  T. 1155; *see also* 1158-59. Specifically, "[petitioner] was upset with the way . . . George had handled things after Mae had passed away," and George's alleged inappropriate interactions with a number of women. T. 1156-57.

Arnold Bauman, petitioner's sister's ex-boyfriend, also testified about what happened when he stopped by and saw petitioner on November 15, 2009.  T. 1164-84.  Upon Bauman's arrival at petitioner's home, petitioner asked Bauman to drive him to a convenience store, as petitioner was too drunk to drive himself, so he could purchase more beer.  T. 1169-1171. Bauman drove petitioner to the store, petitioner bought an eighteen-pack of beer, and they returned to petitioner's home.  T. 1169-1172.  Petitioner then began "talking . . . about . . . a Christmas party," telling Bauman he was upset that George was invited and "if George went

7

near his kids . . . he would punch him . . . ."  T. 1173-74, 1176-77.

Petitioner's aunt, Mae's sister, testified regarding her questions surrounding the circumstances of Mae's death.  T. 1188, 1192-93.  She was told that Mae died of a heart attack in her bedroom; however, she was concerned about the "blood coming from [Mae's] nose or ears," and whether that condition was "normal" during someone's expiration.  T. 1193-94.  She called several people, including petitioner, to get their thoughts on whether the condition was natural or could possibly indicate something else had transpired.  T. 1194-98. Eventually, an unidentified acquaintance, who was also a medical professional, confirmed that bleeding from the nose and ears can happen during death.  T.  1194-95.  That information allowed Mae's sister to accept the fact that her "sister is gone [and she] can't bring her back."  T. 1197.

Petitioner testified that, on November 15, 2009, between 10 AM and 11 AM, he started drinking alcohol while he was making ziti for that night's family dinner.  T. 1231-32.  Bauman came to petitioner's home around 2 PM to drop off some dog food, and petitioner and Bauman then went to the store.  T. 1236-37.  At the store, petitioner purchased more beer and told the store clerk "you won't be seeing me for a while."  T. 1237-38.  Petitioner could not recall why he said that.  T. 1238.  Petitioner and Bauman returned to petitioner's home. T. 1240-41.  During their conversation, Bauman confirmed to petitioner that George had been inappropriate with his sister.  T. 1241.

Bauman left between 3:30 and 4 PM.  T. 1243.  Sometime thereafter, petitioner got into his truck and drove to George's house; however, as of the date of the trial, petitioner could not recall doing that.  T. 1267-68.  Petitioner's purpose in going to George's home was two-fold: "[t]o tell him not to touch [petitioner's] kids at the family Christmas party," and let

8

George know that petitioner "thought he was the biggest disrespectful piece of shit [he] ever knew" given how he acted following his mother's death.  T. 1268.  Petitioner recalled knocking on the door, George answering it, yelling at George, and George punching him on the left side of his face.  T. 1269-70.  Petitioner testified that he recalled pushing George back into the cupboards, but then "draw[s] a huge blank" until they were in George's bedroom and "[George] was on the floor all bloody and . . . called [petitioner] a fucker and [petitioner] just walked out of the house."  T. 1270-72.

Petitioner's next memory was being at home, talking to Ray J.  T. 1273.  Shortly thereafter, Jolene returned home from work and, while she ate dinner, petitioner told her "what had happened up there [at George's house], and that [petitioner had] hurt [George]."  T. 1275.  Petitioner and Jolene went to George's house two times that evening: once for petitioner's hat and again to wipe petitioner's prints from the door handles and phone.  T. 1276-1280.

The following evening, petitioner, Jolene, her mother, and Ray J all left for Connecticut.  1281.  They were stopped by the police the next morning.  T. 1282.  After arriving at the trooper barracks, petitioner was questioned by investigators, waived his *Miranda* rights, and provided them with a truthful, written statement.  T. 1283-85.

### D.    Charge Conference, Deliberations & Verdict

A charge conference was held prior to summations.  T. 1325-1347.  During that conference, petitioner's trial counsel requested, and, after hearing arguments on the matter, was ultimately denied, a charge on extreme emotional disturbance.  T. 1326-37.  After summations (T. 1352-1412, 1421-1456), the verdict sheet was finalized (T. 1456-59), and the court charged the jury (T. 1459-1499).

During deliberations, the jury sent a note to the court asking the court to provide "the definition on intent[.]"  T. 1503.  Counsel and the court discussed what portions of the charge should be repeated in order to answer the jury's question.  T. 1503-07.  Ultimately, all agreed on an "expanded version" of a reading, repeating the intent portions of the charge generally and those paragraphs that were specifically referencing intent in the second degree murder and manslaughter portions of the charge.  T. 1503-1510.  The jurors then sent the court another note, asking the court to repeat two portions of the charge – related to alcohol and intent – and requesting a written copy of the charge.  T. 1511-12.  The court informed counsel that "[o]n consent [the court] can give the[ jurors] copies of the statute," but emphasized that was all the state law provided.  T. 1513.  Because the jury charge included more information than just the statutory language, the court intended to tell that jury that providing a written copy of the charges was "not something that's allowed[.]"  *Id.*  Neither party objected.  T. 1513-14.  When the jurors returned to the courtroom, the judge explained that he was not permitted to provide them with a written copy of the instructions but instead could "read [the instructions] back to [the jury] as many times as [the jurors] want[ed], and [the judge was] happy to [do that] . . . ."  T. 1516.  The requested charges were repeated.  T. 1516-20.  The jury again asked that the entire jury instruction be read back to them, which it was.  T. 1527-40.

The following day, the jury requested, and received, read backs of certain portions of the testimony, as well as the entire jury charge.  T. 1550-1602.  When the jurors resumed deliberations the next day, they again asked for the definition of intent to be read, and the court did so.  T. 1615-1624.  Later that day, the jury found petitioner guilty of murder in the second degree.  T. 1626.

### E.    Direct Appeal

Petitioner filed a counseled brief on direct appeal to the Appellate Division, Third Department, in which he argued as follows: (1) the evidence at trial was legally insufficient to prove his guilt and the verdict was against the weight of the evidence; (2) the court erred in refusing to charge the jury on the affirmative defense of extreme emotional disturbance; (3) trial counsel was ineffective for failing to retain an expert to testify regarding the intoxication and extreme emotional disturbance defenses; and (4) petitioner's sentence was harsh and excessive.  SCR 1-39.  Petitioner also filed a *pro se* supplemental brief, in which he argued as follows: (1) counsel was ineffective for failing to hire an investigator to develop evidence to support the extreme emotional disturbance and intoxication defenses; and (2) the trial court improperly denied the jury a written copy of the jury instructions.  SCR 260-84.

The Third Department affirmed petitioner's conviction.  *King*, 124 A.D.3d at 1065.  With respect to his legal sufficiency claim, the court first found that "[petitioner's] generalized motion to dismiss failed to preserve his legal sufficiency claim . . . ."  *Id.*  In addressing the merits, the court "note[d] that the requisite intent to kill may be inferred from a defendant's actions and the surrounding circumstances . . . [and] whether an individual's level of intoxication negates the element of intent . . . lies within the domain of the jury."  *Id.* (internal quotation marks and citations omitted).  The court discussed how, given the trial testimony, the level of petitioner's intoxication was unclear, though his "longstanding dislike for [the victim was abundantly apparent with the] . . . repeated[] threat[s] to harm or kill[] the victim." *Id.*

> Indeed, [petitioner] told one trial witness on the day of the murder that he was going to "take care of" the victim and, when he returned from the victim's residence, stated that he had "finally [done] it" and

11

> killed the victim. [Petitioner] then, instead of summoning the
> authorities, engaged in elaborate efforts to conceal his involvement
> in the crime and fled the state. The jury could readily infer from this
> evidence that [peitioner] was capable of forming the intent to cause
> the victim's death and, in fact, had done so.

*Id.* at 1065-66.  Although petitioner testified otherwise, "[t]he jury plainly did not believe [his]

version of events, . . . and, deferring to [the jury's] credibility determinations, . . . [the Third

Department] f[ou]nd that the verdict was not against the weight of the evidence."  *Id.* at 1066.

With respect to the court's refusal to charge the jury on extreme emotional

disturbance,

> [the] . . . [c]ourt was obliged to grant [petitioner]'s request . . . if,
> viewing the evidence in the light most favorable to [petitioner], the
> jury could reasonably conclude that, at the time of the homicide, the
> [petitioner] was affected by an extreme emotional disturbance, and
> that the disturbance was supported by a reasonable explanation or
> excuse rooted in the situation as he or she perceived it.  That said,
> evidence demonstrating a . . . high degree of self-control or the
> planned and deliberate character of the underlying attack, as well
> as any postcrime conduct suggesting that the [petitioner] was in full
> command of his . . . faculties and had consciousness of guilt, is
> entirely inconsistent with an extreme emotional disturbance
> defense.

*King*, 124 A.D.3d at 1066 (internal quotation marks and citations omitted).  Petitioner's long-

held and deep-seeded anger, alone, was insufficient to warrant the defense.  *Id.* (citing

cases).  The Third Department affirmed the trial court's denial of the jury charge for several

reasons.  First, petitioner's frequently expressed "desire[s] to harm or kill the victim," as well

as his "deliberate[] travel[] to the victim's residence to confront him on the day of the murder;"

and the lack of overkill suggested a premeditated attack.  *Id.* at 1066-67.  Second, petitioner's

"rational[ acts] . . . after[] . . . the attack, repeatedly returning to the victim's residence to

retrieve items that could be linked to him and to wipe away any fingerprints he left there,

12

destroying or instructing others to conceal clothing that he had worn during the attack, and then fleeing the state," all while seemingly remaining calm to those who saw him during that aftermath, led to the conclusion petitioner acted "in a planned and deliberate manner . . . ." *Id.* at 1067.

With respect to petitioner's ineffective assistance of counsel claim, the court denied that claim on multiple grounds. First, trial counsel's "failure to call . . . a[n expert] witness d[id] not constitute ineffective assistance," especially where such "testimony was not required to prove [an] intoxication defense . . . ." *King*, 124 A.D.3d at 1067. The Third Department rejected petitioner's claim that "trial counsel should have consulted with a medical expert with regard to his extreme emotional disturbance defense . . . for the same reasons." *Id.* The court noted that its "review of the record as a whole confirm[ed] that [petitioner] received meaningful representation." *Id.*

The court declined to review petitioner's allegation that the trial court "failed to adequately respond to a jury request for further instruction [as it was] . . . unpreserved for [the court's] review[.]" *Id.* Finally, the court "examined and [was] unpersuaded by [petitioner's] claim that the sentence imposed was harsh and excessive." *Id.* at 1068.

Petitioner sought leave to appeal to the Court of Appeals, asking the court to consider the same claims he raised below with the exception of his excessive sentence claim. SCR 316-19. On May 20, 2015, the Court of Appeals denied leave to appeal. *People v. King*, 25 N.Y.3d 1073 (2015).

F.    **Motion to Vacate Judgment of Conviction**

Following his direct appeal, pursuant to Criminal Procedure Law § 440.10, petitioner filed a counseled brief in Schoharie County Court arguing that petitioner's conviction should be vacated because trial counsel failed to: (1) present an affirmative defense of extreme emotional disturbance; (2) conduct adequate pretrial investigations; (3) call an expert witness to refute the victim's alleged cause of death; and (4) "present evidence of actual innocence." SCR 325-333.  Attached as an exhibit to the motion was another CPL § 440.10 motion prepared by petitioner, asserting essentially identical claims.  SCR 334-356.

On February 22, 2016, the court denied petitioner's submissions.  SCR 371-73.  The court first addressed petitioner's *pro se* motion, which it refused to consider because he was represented by counsel.  SCR 372.   The court denied the claims of ineffective assistance advanced in petitioner's counseled motion because they were raised and rejected by the Third Department on direct appeal.  SCR 372-73.  Specifically, "[w]here the claim of ineffective assistance of counsel was unsuccessful on direct appeal, it cannot be raised in a subsequent CPL § 440.10 motion."  SCR 373 (citing CPL § 440.10(2)(a); *People v. Dover*, 294 A.D.2d 594, 596 (2d Dep't 2002) *lv denied* 98 N.Y.2d 767 (2002)).

Petitioner sought permission to appeal the court's order, which was denied by the Third Department on May 5, 2016.  SCR 434.  Petitioner then sought permission from the Court of Appeals to appeal the decision.  SCR 435-44.  On October 24, 2016, "the application [wa]s dismissed because the order sought to be appealed from [wa]s not appealable [under New York law]."  SCR 445.

14

### III.    THE PRESENT PETITION

Petitioner seeks habeas relief on the following grounds: (1) the evidence was legally insufficient to support his conviction; (2) the trial court erred when it denied petitioner's request for a jury instruction on the defense of extreme emotional disturbance; (3) trial counsel was ineffective for failing to call an expert witness to establish an intoxication defense; and (4) the trial court erred in its response to the jury note requesting a written copy of the court's charge.  Pet. at 5-16.

### IV.    DISCUSSION

####    A.    Standard of Review

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), a federal court may grant habeas corpus relief with respect to a claim adjudicated on the merits in state court only if, based upon the record before the state court, the state court's decision (1) "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or (2) "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. §§ 2254(d)(1), (2); *Cullen v. Pinholster*, 563 U.S. 170, 180-81, 185 (2011); *Premo v. Moore*, 562 U.S. 115, 120-21 (2011); *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007).  This standard is "highly deferential" and "demands that state-court decisions be given the benefit of the doubt."  *Felkner v. Jackson*, 562 U.S. 594, 598 (2011) (per curiam) (quoting *Renico v. Lett*, 559 U.S. 766, 773 (2010) (internal quotation marks omitted)).

The Supreme Court has repeatedly explained that "a federal habeas court may overturn a state court's application of federal law only if it is so erroneous that 'there is no

possibility fairminded jurists could disagree that the state court's decision conflicts with th[e Supreme] Court's precedents.'" *Nevada v. Jackson*, 569 U.S. 505, 508-09 (2013) (per curiam) (quoting *Harrington v. Richter*, 562 U.S. 86, 102 (2011)); *see Metrish v. Lancaster*, 569 U.S. 351, 358 (2013) (explaining that success in a habeas case premised on § 2254(d)(1) requires the petitioner to "show that the challenged state-court ruling rested on 'an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement'") (quoting *Richter*, 562 U.S. at 103)).

Additionally, the AEDPA foreclosed "using federal habeas corpus review as a vehicle to second-guess the reasonable decisions of state courts." *Parker v. Matthews*, 567 U.S. 37, 38 (2012) (per curiam) (quoting *Renico,* 559 U.S. at 779). A state court's findings are not unreasonable under §2254(d)(2) simply because a federal habeas court reviewing the claim in the first instance would have reached a different conclusion. *Wood v. Allen*, 558 U.S. 290, 301 (2010). "The question under AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable–a substantially higher threshold." *Schriro*, 550 U.S. at 473.

Federal habeas courts must presume that the state courts' factual findings are correct unless a petitioner rebuts that presumption with "clear and convincing evidence." *Schriro*, 550 U.S. at 473-74 (quoting 28 U.S.C. § 2254(e)(1)). "A state court decision is based on a clearly erroneous factual determination if the state court failed to weigh all of the relevant evidence before making its factual findings." *Lewis v. Conn. Comm'r of Corr.*, 790 F.3d 109, 121 (2d Cir. 2015) (internal quotation marks omitted). Finally, "[w]hen a state court rejects a federal claim without expressly addressing that claim, a federal habeas court must presume that the federal claim was adjudicated on the merits[.]" *Johnson v. Williams*, 568 U.S. 289,

301 (2013).

**B.    Legal Sufficiency[1]**

Petitioner asserts that the evidence was legally insufficient to support his conviction.

Pet. at 5, 15.  "[T]he critical inquiry on [the] review of the sufficiency of the evidence . . .  [is]

whether the record evidence could reasonably support a finding of guilt beyond a reasonable

doubt." *Jackson v. Virginia*, 443 U.S. 307, 318 (1979).  The reviewing court must determine

if, "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier

of fact could have found the essential elements of the crime beyond a reasonable doubt."  *Id.*

at 319 (emphasis in original).  The reviewing court must be mindful that, when "faced with a

record of historical facts that supports conflicting inferences [it] must presume – even if it

does not affirmatively appear in the record – that the trier of fact resolved any such conflicts

in favor of the prosecution, and must defer to that resolution." *Cavazos v. Smith*, 565 U.S. 1,

7 (2011) (internal quotation marks and citations omitted).  In seeking habeas corpus review, a

petitioner who claims that the evidence was insufficient to sustain a conviction bears a "very

heavy burden." *Fama v. Comm'r of Corr. Servs.*, 235 F.3d 804, 811 (2d Cir. 2000).

Here, petitioner claims that his conviction is not supported by legally sufficient

evidence because he lacked the requisite intent to be convicted of second degree murder.

However, viewing the evidence in the light most favorable to the prosecution and drawing all

permissible inferences in its favor, a rational fact finder could have found – and did find –  that

petitioner acted with an intention to kill.  The petitioner consistently voiced his hatred of

---

[1] The Court notes that, as the Third Department observed in passing, petitioner "failed to preserve his legal sufficiency claim" for appellate review because his motion to dismiss on that ground was "generalized." *King*, 124 A.D.3d at 1065.  However, the Third Department "nevertheless assess[ed] whether all elements of the charged crime were proven in the context of" adjudicating petitioner's weight-of-the-evidence argument.  *Id.*  As a result, under the circumstances of this case, the Court will address the merits.

17

George.  Petitioner told other people that he wanted to kill him.  T. 491, 529, 538, 1155-59.

Petitioner threatened George himself.  T. 493.  Immediately prior to the murder, petitioner

informed Jolene's sons that he was going to "take care of" George and then reported that he

had "finally" "killed the son of a bitch," when he came home.  T. 683, 744.  Petitioner

appeared calm to the people who saw and spoke with him after the murder, and petitioner

was also able to engage in elaborate efforts to conceal his involvement and attempt to

prevent detection.  T. 684-85, 689, 727, 744, 748-49, 774-75.  Petitioner either independently

destroyed or instructed others to conceal his bloody clothing, petitioner and Jolene went back

to George's to try and erase any evidence of petitioner's presence there, and then petitioner

hatched a plan to leave the state and hide.  T. 690-91, 749-50, 763-67, 774, 819-820, 903-

05, 975-76.  As the Third Department reasonably concluded, the trial evidence was more

than sufficient to establish that petitioner intentionally killed George.  *King*, 124 A.D.3d at

1065-66.

Petitioner contends that he was too intoxicated to form the intent required to be guilty

of second degree murder.  Pet. at 15.  "[I]ntoxication is not actually a complete affirmative

defense to a criminal charge; it rather merely reduces the gravity of the offense by negating

the specific intent element of the crime charged."  *Garfield v. Poole*, 421 F. Supp. 2d 608, 612

(W.D.N.Y. 2006).  The threshold to negate intent is "quite high" and "even an intoxicated

person may be capable of forming the requisite intent."  *Id.* at 612-13.  The jury is charged

with evaluating whether a defendant was too intoxicated to form the specific intent required

for the crime, and it can make those determinations by considering not only the defendant's

testimony, but also any other "strong, specific testimonial evidence indicating that [defendant]

formed the requisite intent to commit his crimes."  *Waiters v. Lee*, 857 F.3d 466, 481 (2d Cir.

2017) (discussing how intoxication could possibly impact the intent element of specific intent crimes and what latitude the jury has when evaluating such claims); *United States v. Crowley*, 236 F.3d 104, 111 (2d Cir. 2000) ("Whether to infer from this evidentiary foundation that [defendants] were too intoxicated specifically to intend to [commit a specific intent crime] . . . was a question for the jury.").

Here, petitioner testified that he could barely recall anything from the night in question; therefore, he was incapable of forming the intent to kill George.  However, the testimony from others who interacted with petitioner prior to and on the day of the murder, in conjunction with petitioner's voluntary statement given to the authorities two days after the murder, are inconsistent with petitioner's present testimony.  Petitioner indicated to those around him, as close as minutes before leaving for George's home, that he meant to harm George. Petitioner's written statement reported that petitioner remembered trading punches with George, causing the blunt force trauma that led to the swelling and hemorrhages that killed him, and intentionally returned to the scene and disposed of his clothes in attempts to conceal his involvement.  Given the totality of the evidence presented, the jury's rejection of petitioner's intoxication defense was reasonable.  *See People v. Santana*, 169 A.D.2d 641 (1st Dep't 1991) ("There was . . . sufficient support for the view that defendant's consumption of drugs did not render him so intoxicated as to be unable to form the requisite intent, since immediately after the shooting, he concealed the weapon.").  As the Third Department aptly concluded, "[t]he jury plainly did not believe [petitioner's] version of events[.]"  *King*, 124 A.D.3d at 1066.  There is no basis for upsetting the jury's credibility determination here.

For the foregoing reasons, petitioner's legal sufficiency claim does not entitle him to habeas relief.

## C.    Charge of Extreme Emotional Disturbance[2]

Petitioner argues that the trial court erred when it refused to charge the jury on the affirmative defense of extreme emotional disturbance ("EED").  Pet. at 7, 16.  In determining whether such a deprivation is actionable, "the court must first determine whether [petitioner] was entitled to the charge as a matter of New York State law[, which] . . . requires consultation with state law and deference to the state-courts' interpretation of the state's laws, to the extent that [they] . . . are constitutional."  *Smith v. Perez*, 722 F. Supp. 2d 356, 379 (W.D.N.Y. 2010) (citing *Davis v. Strack*, 270 F.3d 111 (2d Cir. 2001)).  "Stated another way, this [c]ourt sitting in habeas review is not charged with interpreting New York's law on extreme emotional disturbance, but rather with determining whether the evidence was sufficient to warrant an EED charge under New York law."  *Id.* at 380.  Only if the denial of the jury charge "was erroneous as a matter of New York state law . . . [will the habeas court] consider whether the error so infected the entire trial that the resulting conviction violates due

---

[2]  Respondent contends that petitioner's claim that the trial court should have charged the jury on the affirmative defense of extreme emotional disturbance was unexhausted because petitioner failed to present the claim in federal constitutional terms.  Resp. Memorandum of Law at 21.  Respondent is correct in asserting that to satisfy the exhaustion requirement petitioner must "fairly present" each claim for habeas relief in "each appropriate state court (including a state supreme court with powers of discretionary review), thereby alerting that court to the federal nature of the claim." *Baldwin v. Reese*, 541 U.S. 27, 29 (2004) (citations omitted); *Fama v. Comm'r. of Corr. Servs.*, 235 F.3d 804, 808 (2d Cir. 2000).  However, in petitioner's counseled brief to the Third Department, petitioner relied upon *People v. Patterson*, 39 N.Y.2d 288, 303 (1976).  In *Patterson*, citations were made to several Supreme Court cases to support the court's discussion about whether the affirmative defense of extreme emotional distress comported with the due process clause of the Constitution and ensured that prosecutors were held to their burden of proving guilt beyond a reasonable doubt. 39 N.Y.2d at 303 (citing *Mullaney v. Wilbur*, 421 U.S. 684 (1975); *In re Winship*, 397 U.S. 358 (1970)).  These discussions, citing the Constitution and placing the nature of the rights of individuals in federal terms, were sufficient to fairly present and, therefore, exhaust petitioner's claims.  These claims were also renewed in petitioner's leave to appeal to the Court of Appeals; accordingly, the state courts have been informed and given the opportunity, pursuant to a complete round of appeals, to resolve the  aforementioned claim. While the claims have been properly exhausted, they are plainly meritless and should still be dismissed.

process."  *Id.* at 382 (internal quotation marks and citations omitted).

"Under New York law, extreme emotional disturbance is a partial affirmative defense to the crime of second degree murder."  *Bonilla v. Lee*, 35 F. Supp. 3d 551, 567 (S.D.N.Y. 2014) (citing Penal Law §§ 125.25(1)(a) & 125.20(2)).  "[T]he affirmative defense . . . reduces intentional murder to first degree manslaughter if the defendant establishes . . . [by a preponderance of the evidence] that he or she acted under the influence of an extreme emotional disturbance, and . . . that there was a reasonable explanation or excuse for that disturbance."  *Smith*, 722 F. Supp. 2d at 379-80.

A criminal defendant acting under the stress of EED "typically manifest[s that behavior] by a loss of self-control," and, "[i]n determining whether a defendant has acted out of a loss of self-control, courts typically consider the defendant's conduct before and after the homicide in question."  *Bonilla*, 35 F. Supp. 3d at 567.  Subsequent actions to conceal involvement in prior criminal activity have consistently been found to constitute a factor weighing against giving a jury instruction for the affirmative defense.  *See id.* at 568 (finding subsequent actions which "attempt[] to avoid apprehension reveal an enduring regard for self-preservation that undermines any claim that the petitioner lost . . . control . . .") (internal quotation marks and citations omitted); *Shiwlochan v. Portuondo*, 345 F. Supp. 2d 242, 269 (E.D.N.Y. 2004) (holding that "leaving the scene of the crime and taking other steps to avoid apprehension have been found to be inconsistent with the loss of control associated with an EED defense"), *aff'd* 150 F. App'x 58 (2d Cir. 2005); *see also People v. Roche*, 98 N.Y.2d 70, 77 (2002) (upholding refusal to provide an EED defense because the "behavior prior to and immediately after the crime," such as lying about the cause of the victims wound and concealing incriminating evidence, "[is] not indicative of extreme emotional disturbance");

21

*People v. Pavone*, 117 A.D.3d 1329, 1332 (3rd Dep't 2014) ("[E]vidence demonstrating a defendant's high degree of self-control or the planned and deliberate character of the underlying attack, as well as any postcrime conduct suggesting that the defendant was in full command of his or her faculties and had consciousness of guilt is entirely inconsistent with [the] . . . defense.") (internal quotation marks and citations omitted).

In this case, giving the appropriate measure of deference to the state courts' decisions and based on a review of the record, the state courts' decisions were reasonable as petitioner's testimony did not establish, by a preponderance of the evidence, that he was acting under an EED. The Third Department reasoned that petitioner's numerous "express[ions of] his desire to harm or kill the victim and [the] deliberate[] travel[] to the vitctim's residence . . . suggest[ed] . . . premeditat[ion] . . . ." along with the lack of overkill. *King*, 124 A.D.3d at 1066-67. Further, petitioner's rational behavior subsequent to the attack – returning to the crime scene to retrieve or erase incriminating evidence, destroying or concealing his clothing worn during the attack, remaining calm after the fight, and absconding to Connecticut – "demonstrates that [petitioner] behaved in a planned and deliberate manner and was not acting out of extreme mental trauma or extremely unusual and overwhelming stress when he killed the victim." *Id.* at 1067 (citations omitted). The state courts considered the relevant factors in their evaluation of petitioner's actions both before and after the murder to determine whether he was acting out of a loss of control due to extreme and overwhelming stress.

Because the state courts' decisions not to issue the requested jury charge were not erroneous as a matter of New York law, habeas review is unwarranted. "Due process does

not require the giving of a jury instruction when such charge is not supported by the evidence." *Smith*, 722 F. Supp. 2d at 382 (citations omitted).

Accordingly, habeas relief is denied.

### D.    Ineffective Assistance of Counsel

Petitioner argues that trial counsel's failure to retain and solicit expert testimony regarding his intoxication, which would have provided the foundation to prove his resulting inability to form the requisite intent for second degree murder, rendered counsel's representation unconstitutional. Pet. at 8, 16.  To demonstrate constitutionally ineffective assistance of counsel, a petitioner must show that counsel's performance fell below an objective standard of professional reasonableness, and but for counsel's alleged errors, the result of the proceedings would have been different.  *Premo v. Moore*, 562 U.S. 115, 121-22 (2011); *Strickland v. Washington*, 466 U.S. 668, 694 (1984).  The standard "must be applied with scrupulous care" in habeas proceedings, because such a claim "can function as a way to escape rules of waiver and forfeiture and raise issues not presented at trial [or in pretrial] proceedings[.]"  *Premo*, 562 U.S. at 122.  "*Strickland* does not guarantee perfect representation, only a reasonably competent attorney."  *Harrington v. Richter*, 562 U.S. 86, 110 (2011) (quoting *Strickland*, 466 U.S. at 687) (internal quotation marks and further citation omitted).  A petitioner must overcome "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance . . . [and] that, under the circumstances, the challenged action 'might be considered sound trial strategy.'"  *Strickland*, 466 U.S. at 689 (quoting *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)).  Even if petitioner can establish that counsel was deficient, he still must show that he suffered prejudice.  *Id.* at 693-94.

"In assessing [counsel's] performance, [the court] must apply a heavy measure of deference to counsel's judgments." *Greiner v. Wells*, 417 F.3d 305, 319 (2d Cir. 2005) (internal quotation marks and citations omitted). "Constitutionally effective counsel embraces a 'wide range of professionally competent assistance' and 'counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment.'" *Id.* (citing *Strickland*, 466 U.S. at 690). That being said, "counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary . . . [A] particular decision not to investigate must be directly assessed for reasonableness in all the circumstances . . . ." *Strickland*, 466 U.S. at 691. "[W]hen there is reason to believe that pursuing certain investigations would be fruitless or even harmful, counsel's failure to pursue those investigations may not later be challenged as unreasonable." *Greiner*, 417 F.3d at 321 (internal quotation marks omitted). A similar inquiry surrounds challenges regarding witnesses as "[t]he decision not to call a particular witness is typically a question of trial strategy that reviewing courts are ill-suited to second-guess. . . . Thus, counsel's decision as to whether to call specific witnesses – even ones that *might* offer exculpatory evidence – is ordinarily not viewed as a lapse in professional representation." *Id.* at 323 (internal quotation marks and citations omitted) (emphasis added); *see also Mills v. Poole*, No. 1:06-CV-0842, 2008 WL 2699394, at *26 (W.D.N.Y. June 30, 2008) ("In general, whether or not to hire an expert is the type of strategic choice by counsel that may not be second-guessed on habeas corpus review.") .

Here, the Third Department determined trial counsel's decision not to retain an expert did not rise to the level of ineffective assistance because an expert was not necessary to prove petitioner's proffered defenses and based on a "review of the record as a whole . . .

24

[petitioner] received meaningful representation." *King*, 124 A.D.3d at 1067.  In the present petition, petitioner's contention remains that he was prejudiced by trial counsel's failure to call an expert witness to establish his intoxication defense.   However, petitioner cannot establish either prong of the *Strickland* test: there is nothing in the record to support the conclusion that counsel's performance was objectively unreasonable or incompetent or that petitioner was prejudiced by not having an expert witness.

First, second-guessing trial counsel's decision about retaining an expert witness is exactly the type of strategic choice about which courts reviewing habeas petitions have been cautioned. *Greiner*, 417 F.3d at 323.  Selecting defenses to present and how to present them are tactical decisions within the professional purview of the attorney.  For the reasons discussed below, there is no indication that the jury would have been persuaded by such expert testimony, further supporting counsel's decision finding such expert testimony unnecessary.

Second, there is nothing in the record, other than petitioner's own contentions, to establish that pursuing such testimony would have been available or effective.  *See Franco v. Lee*, No. 2:10-CV-1210, 2013 WL 704655, at *13 (E.D.N.Y. Feb. 26, 2013) ("Petitioner's own testimony is the only support for his assertion that he was sufficiently intoxicated at the time of his interrogation to render his confession involuntary, and there is no indication that an expert was available and willing to testify in support of his position."); *Mills v. Lempke*, No. 1:11-CV-0440, 2013 WL 435477, at *19 (W.D.N.Y. Feb. 4, 2013) (denying petitioner's ineffective assistance of counsel claim in part because petitioner failed to "come forward with affidavits or other admissible evidence showing that there was, indeed, an expert witness who would have testified as he hoped" and his assertions were speculative).

25

Third, the presentation of expert testimony regarding intoxication would not have changed the result of the case because the jury (1) heard evidence of intoxication from the testimony of Ray J, Davy, Bauman, petitioner's siblings, and petitioner himself, (2) was charged on intoxication and its legal ramifications, and (3) decided to convict petitioner regardless.  *Conely v. Ebert*, No. 2:05-CV-5810, 2007 WL 137148, at *7 (E.D.N.Y. Jan. 10, 2007) (denying claims of ineffective assistance for lack of prejudice where, despite the absence of expert testimony on intoxication, the issue "was placed before the jury for their consideration . . . the[y] . . . received a specific instruction regarding intoxication . . .," and petitioner was still convicted illustrating that "the intoxication defense was raised before . . . and rejected by the jury"); *see also Franco*, 2013 WL 704655, at *13 (denying ineffective assistance of counsel claim where "petitioner testified at trial that he was intoxicated" and, as a result, "the question . . . was presented to the jury").  In light of the evidence presented at trial, "there is no substantial likelihood that a[n expert's] testimony would have changed the jury's findings." *Franco*, 2013 WL 704655, at *14.  Because the record does not suggest that defense counsel's performance was deficient or that petitioner was prejudiced by any of counsel's decisions, the Third Department reasonably concluded that counsel was not ineffective.

Accordingly, petitioner's ineffective assistance of counsel claim does not entitle him to habeas relief.

### E.    Jury Instructions

Petitioner contends that the trial court erred by refusing the jury's request to provide it with a written copy of the court's charge.  Pet. at 10.

26

**1.    Procedural Default**

Regardless of the claim, a federal court is precluded from issuing a writ of habeas

corpus if an adequate and independent state-law ground justifies the petitioner's detention.

*See Wainwright*, 433 U.S. at 81-85.  Accordingly, "[f]ederal courts generally will not consider

a federal issue in a case 'if the decision of the state court rests on a state law ground that is

independent of the federal question and adequate to support the judgment."  *Garvey*, 485

F.3d at 713 (quoting *Lee*, 534 U.S. at 375).  This results in a state-law procedural default.

*Ylst*, 501 U.S. at 801.  This analysis applies with equal force "whether the independent state

law ground is substantive or procedural . . . ."  *Garvey*, 485 F.3d at 713 (citing *Lee*, 534 U.S.

at 375).  Pursuant to this analysis, a state law ground is generally adequate where "it is firmly

established and regularly followed in the state;" however, "in certain limited circumstances,

even firmly established and regularly followed state rules will not foreclose review of a federal

claim if the application of the rule . . . [wa]s exorbitant."  *Id.* at 713-14 (internal quotation

marks omitted) (citing *Lee*, 534 at 376).  Exorbitant application of a generally sound rule

requires consideration of

> (1) whether the alleged procedural violation was actually relied on
> in the trial court, and whether perfect compliance with the state rule
> would have changed the trial court's decision; (2) whether state
> caselaw indicated that compliance with the rule was demanded in
> the specific circumstances presented; and (3) whether petitioner
> had "substantially complied" with the rule given "the realities of
> trial," and, therefore, whether demanding perfect compliance with
> the rule would serve a legitimate government interest.

*Cotto*, 331 F.3d at 240 (citing *Lee*, 534 at 381-85).

"[I]n order to preserve a claim of error in the admission of evidence or a charge to the

jury, a defendant must make his or her position known to the court."  *Gray*, 86 N.Y.2d at 19

(citing CPL § 470.05); *see also Downs*, 657 F.3d at 103 ("The relevant part of the contemporaneous objection rule . . . provides that . . . New York appellate courts will review only those errors of law that are presented at a time and in a manner that reasonably prompted a judge to correct them . . . ."). "The chief purpose of demanding notice through [specific] objection or motion in a trial court . . . is to bring the claim to the trial court's attention. A general motion fails at this task." *Gray*, 86 N.Y.2d at 20. The Second Circuit has long held "that the contemporaneous objection rule is a firmly established and regularly followed New York procedural rule . . . [and] constitutes an independent and adequate state law ground for disposing of a claim . . . ." *Downs*, 657 F.3d at 104.

Here, the Third Department rejected petitioner's claim that the trial court failed to adequately respond to the jury request for further instructions as unpreserved. *King*, 124 A.D.3d at 1067-68 (citing *People v. Green*, 119 A.D.3d 23, 30 (3rd Dep't 2014) (relying on *inter alia,* CPL 470.05(2), for the proposition that "[d]efendant's assertions that County Court . . . failed to meaningfully respond to the jury's requests for further instruction . . . are unpreserved for our review, as the record reveals that defendant raised no objections thereto."). Trial counsel failed to object to the court's decision not to provide the jury with written instructions per the jury's request. "Because petitioner's failure to comply with section CPL 470.05(2) is an independent and adequate state law ground," the Third Department's decision bars federal habeas review of this claim. *Ortiz v. New York*, No. 1:12-CV-1116, 2013 WL 1346249, at *8 (E.D.N.Y. Mar. 31, 2013).

Further, examination of the *Cotto* factors supports the conclusion that application of the procedural bar was not exorbitant. The Third Department clearly relied upon the failure to contemporaneously object to reject petitioner's arguments; however, the court went on to

consider the merits of the claim, indicating that the analysis would not have changed had

petitioner properly preserved his claim.  Second, the Court of Appeals has consistently held

that claims related to jury charges are subject to the contemporaneous objection rule and it

must be followed to be properly preserved for appellate review.  *Green*, 119 A.D.3d at 30

(collecting cases).  Lastly, petitioner did not properly comply with the rule despite the clear

case law that instructs that objections are required preserve claims regarding jury requests.

*Id.*  Thus, the procedural bar precludes habeas relief.

Procedurally defaulted claims are not subject to habeas review unless a petitioner

shows cause for the default and actual resulting prejudice, or that the denial of habeas relief

would result in a fundamental miscarriage of justice, i.e., that he or she is actually innocent.

*House*, 547 U.S. at 536-39; *Schlup*, 513 U.S. at 327.  To establish cause, petitioner must

show that some objective external factor impeded his ability to comply with the relevant

procedural rule.  *Maples*, 565 U.S. at 280; *Coleman*, 501 U.S. at 753.  If a petitioner fails to

establish cause, a court need not decide whether he suffered actual prejudice, because

federal habeas relief is generally unavailable as to procedurally defaulted claims unless both

cause and prejudice are demonstrated.  *See Murray*, 477 U.S. at 496 (referring to the

"cause-and-prejudice standard"); *Stepney*, 760 F.2d at 45.

Here, petitioner has not asserted that cause for the default exists or that he is actually

innocent.  Although petitioner raises an ineffective assistance of counsel claim, he does not

identify his trial counsel's failure to preserve the jury request claim as the basis for the

ineffective assistance claim.[3]  Further, the ineffective assistance claim is without merit

---

[3] With respect to the bar of procedural default, cause can be demonstrated, "in certain circumstances[, by] counsel's ineffectiveness in failing [to] properly preserve [a] claim for review in state court . . . ."  *Edwards v. Carpenter*, 529 U.S. 446, 451 (2000) (citations omitted).

therefore it cannot serve as cause for any procedural default.[4]  Because cause has not been established, no discussion of prejudice is necessary.

Thus, petitioner's claim is barred from review.

## 2.    Merits

Even if petitioner's claim were not procedurally defaulted, it would afford him no basis for relief.  As an initial matter, petitioner frames his claim as a violation of CPL § 310.30[5]. SCR 283.  Because CPL § 310.30 is a "state statutory law, it does not present a question of federal constitutional magnitude amenable to habeas review."  *Velazquez v. Artus*, No. 6:14-CV-6265, 2015 WL 1097409, at *5 (W.D.N.Y. Mar. 11, 2015) (citing *Serrano v. Kirkpatrick*, No. 1:11-CV-2825, 2013 WL 3226849, *11 (S.D.N.Y. Jun. 25, 2013) ("A claim premised on a violation of [CPL § 310.30] does not allege a violation of a federally protected right, as required by AEDPA. . . . Accordingly, the argument is a state law claim that is not cognizable upon federal habeas review.") (citations omitted)).

Moreover, even if petitioner's claim were cognizable and stated in constitutional terms,

> [t]he issue to be determined when a challenge to a state trial court's charge is raised in a federal habeas corpus proceeding is not whether the instruction is undesirable, erroneous, or even universally condemned. . . . Rather, it must be determined whether the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process. . . . [A]n omission, or an incomplete instruction, is less likely to be prejudicial than a misstatement of the law.

*United States, Ex rel. Mulero v. Lefevre*, No. 9:85-CV-4013, 1990 WL 18213, at *4 (E.D.N.Y.

---

[4]  Generally speaking, the ineffectiveness of counsel must be so severe that the ineffectiveness "*itself* [constitutes] an independent constitutional claim."  *Id.*

[5]  This statutory section provides in pertinent part that a "jury may request . . . further instruction or information. . . . With the consent of the parties and upon the request of the jury . . ., the court may also give to the jury copies of the text of any statute which . . . the court deems proper."  CPL § 310.30.

Feb. 20, 1990) (internal quotation marks and citations omitted).  In this case, petitioner does not challenge the content of the charge.  Further, the trial court offered to read the charge as many times as the jury needed, and it read the charge several times over the course of deliberations.  To the extent any error was made, it was harmless.  *See Thurston v. McGinnis*, No. 2:02-CV-6157, 2003 WL 22956983, at *5 (E.D.N.Y. Oct. 15, 2003) (holding harmless error where court mistakenly thought it could not "provide the jury with the written text of the statute," because "[t]he court read back all of the charges to the jury," resulting in no prejudice or fear of an unfair trial for petitioner).

For the foregoing reasons, petitioner is not entitled to habeas relief.  The petition is denied and dismissed.

## V.    CONCLUSION

**WHEREFORE**, it is hereby

**ORDERED** that the petition (Dkt. No. 1) is **DENIED AND DISMISSED IN ITS ENTIRETY**; and it is further

**ORDERED** that no Certificate of Appealability ("COA") shall issue because petitioner failed to make a "substantial showing of the denial of a constitutional right" as 28 U.S.C. § 2253(c)(2) requires;[6] and it is further

**ORDERED** that any further request for a Certificate of Appealability must be addressed to the Court of Appeals (Fed. R. App. P. 22(b)); and it is further

---

[6] *Miller-El v. Cockrell*, 537 U.S. 322, 336 (2003); *see Richardson v. Greene*, 497 F.3d 212, 217 (2d Cir. 2007) (holding that if the court denies a habeas petition on procedural grounds, "the certificate of appealability must show that jurists of reason would find debatable two issues: (1) that the district court was correct in its procedural ruling, *and* (2) that the applicant has established a valid constitutional violation" (emphasis in original)).

**ORDERED** that the Clerk serve a copy of this Decision and Order on the parties in accordance with the Local Rules.

**IT IS SO ORDERED**.

Dated: April 23, 2018
      Albany, New York.

Mae A. D'Agostino
U.S. District Judge

32